ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-40006-JAR |
| | ) | |
| NICOLAS PAEZ, and RAMON PAEZ-MATA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM ORDER

This matter comes before the Court on defendant Ramon Paez-Mata's Motion to

Suppress Statement (Doc. 16) and Motion for Discovery Related to Drug Detection Dog (Doc.

18) and on  defendant Nicolas Paez's Motion to Suppress Illegal Seizure and Fruits Thereof

(Doc. 34).  The Court conducted an evidentiary hearing on defendants' motions on June 1,

2009.[1]  Having reviewed the parties' filings and the evidence adduced at the hearing, the Court is

prepared to rule.  For the reasons stated below, defendants' motions to suppress are denied and

defendant Paez-Mata's motion for discovery related to drug detection dog is granted in part and

denied in part.

## I.      Factual Background

On January 25, 2009, Ryan Wolting, a Kansas State Trooper, was patrolling near Salina,

Kansas when he observed a semi-trailer eastbound on I-70 with an illegible Indiana tag.  Trooper

Wolting pulled over the semi-trailer for a tag violation and to conduct a Commercial Vehicle

---

[1]At this hearing, the Court orally granted defendant Paez's Motion for Joinder (Doc. 23) and defendant
Paez-Mata's Motion to Sever (Doc. 17).  *See* Minute Entry, Doc. 40.

Safety Alliance ("CVSA") inspection.  Trooper Wolting parked his vehicle behind the semi-trailer and left his lights flashing for the duration of the roadway encounter.  After Trooper Wolting stopped the vehicle, he noticed that the tag was expired.  Defendant Nicolas Paez was the driver of the vehicle, and his brother, defendant Ramon Paez-Mata was riding in the sleeper compartment of the cab; he was not acting as a "co-driver" of the vehicle.  Defendant Paez-Mata handed Trooper Wolting a Colorado identification card.  Defendant Paez appeared nervous, calling Trooper Wolting "Sir" several times; his nervousness did not subside during the twenty-minute roadway stop, although Trooper Wolting was only with defendant Paez for a few minutes of the entire roadway stop.  Defendant Paez told Trooper Wolting that he owned the trucking company, which owns three trucks.

Trooper Wolting noted the Department of Transportation ("DOT") and unit numbers on the semi-trailer truck were  relatively high numbers.  In Trooper Wolting's training and experience, a small company with only three trucks in its inventory ordinarily would not assign high unit numbers to the few vehicles in its fleet; and the use of a high unit number by a small company is sometimes an attempt to make the company appear bigger than it is, to cover up criminal activity.  Trooper Wolting has also been trained that a high DOT number, which signifies that it belongs to a newer company, can also indicate criminal activity.  Older companies have lower DOT numbers and are more likely not engaged in criminal activity, because older ompanies that had been conducting criminal activity tend to have been already been caught.  Trooper Wolting noted that the log book provided by defendant Paez showed that immediately before this trip, the vehicle had been idle for three days in California.  Trooper Wolting testified that in his training and experience, this is a long time for a truck not to be

traveling, as trucking companies make no money when the trucks are idle.  Trooper Wolting also discovered through EPIC that there were active drug investigations for both defendants.

Ultimately, Trooper Wolting determined that the tag on the vehicle was in fact valid and he decided not to issue a citation.  He thanked defendant Paez, returned his documentation and told him he needed to return the CVSA form.  Trooper Wolting then said, "thank you, be safe, good luck," and started to turn away.  Defendant Paez immediately asked how far the Petro station was from where they were stopped.  Trooper Wolting told him it was about twenty miles from where they were and then asked if he could ask defendant Paez more questions.  Paez indicated assent.  Trooper Wolting asked if defendant Paez had ever been arrested and if he could search the vehicle; defendant Paez agreed.  Because Trooper Wolting preferred not to search the vehicle at the roadside for safety reasons, he asked defendant Paez to follow him to the Petro station and defendant Paez agreed.  The brothers drove the truck to the Petro station; Trooper Wolting drove separately, in his patrol car.  The drive took between twelve and fifteen minutes.

After arriving at the Petro station, Trooper Wolting again asked if he could search the vehicle and defendant Paez again agreed.  Two other troopers arrived at the Petro station to assist Trooper Wolting: Troopers Matthews and Taylor; Trooper Matthews was already present when Trooper Wolting obtained consent this second time.  Trooper Matthews testified that Trooper Wolting never placed his hand on his weapon, nor used a commanding voice.  The brothers initially stood next to the truck during the search, but eventually, due to the cold weather conditions, they sat in Trooper Taylor's vehicle.  Defendant Paez was seated in front and defendant Paez-Mata was seated in the back seat of the car.  Neither was handcuffed.  They

remained in Trooper Taylor's patrol car for approximately twenty minutes.  From where defendants were seated, they could not monitor the search of the truck.

Trooper Wolting began searching the sleeper area of the truck and noticed that the screws holding the headliner up did not latch and that they appeared to have been replaced because they were of different types and sizes.  Trooper Wolting also noticed that the panels of the headliner did not look firmly fixed, and appeared as though they had been removed at some prior time. Trooper Matthews searched the closet area behind the driver's seat and found two small duffel bags containing clothing and one larger duffel bag that contained only another empty duffel bag; they smelled of soap powder.  Troopers Wolting and Matthews testified that the empty bags are a consistent indicator of transporting drugs.[2]  Trooper Matthews testified that in his experience, soap powder is used as a masking agent for the smell of drugs.

Trooper Matthews then deployed his drug-detection dog, Wyatt, so that the troopers could determine which headliner panels to remove during their search.  Wyatt alerted by intensely sniffing inside the closet area, near where they found the duffel bags.  Trooper Wolting then removed the dome light and noticed more suspicious screws, along with new holes.  When he shined a flashlight at the hole, Trooper Wolting noticed an item and used an ink pen as a probe to see if it moved.  Trooper Wolting then pulled the headliner down to discover after-market access panels, which in his experience are used to conceal illegal contraband.  After opening the after-market compartment, Trooper Wolting discovered forty bundles of cocaine.

On January 25, 2009, David Heim, a trooper assigned to the DEA, interviewed defendant Paez in Salina, Kansas.  At 8:30 a.m., Heim met with defendant Paez, along with another agent

---

[2]Trooper Wolting testified that the size of these empty bags is consistent with the space needed to transport the approximately forty kilograms of drugs discovered in the truck.

and a Salina police officer who spoke Spanish.  Heim read defendant Paez his *Miranda* rights in
English and asked him if he understood.  Defendant Paez said "yes," he understood, but five
minutes into the conversation, Heim asked him if he wanted to pursue the rest of the interview in
Spanish because he was having difficulty understanding the questions posed to him in English.
Defendant said "yes" and the interrogation proceeded using the Spanish-speaking officer as an
interpreter.  The statement was not recorded.

On February 26, 2009, DEA Agent Greg Anderson drove defendant Paez-Mata to his
initial appearance court hearing in this matter in Topeka, Kansas.  Heim was also present.
During the drive, Agent Anderson and defendant Paez-Mata discussed family, weather and the
economy.  They also discussed defendant Paez-Mata's January arrest.  Agent Anderson testified
that he inverviewed defendant Paez-Mata with the approval of his attorney, Joe Allen and that he
would not have interviewed him otherwise.  Allen told Anderson that it was alright if Paez-Mata
agreed and they had to let the prosecutor know if defendant Paez-Mata was cooperative and gave
statements about the case.  Defendant Paez-Mata told Agent Anderson that before the arrest, he
drove the truck owned by a cousin and met defendant Paez.  Allen also told Anderson that he had
been able to communicate with defendant Paez-Mata effectively without an interpreter.  Agent
Anderson was able to converse with defendant Paez-Mata, who gave him a statement admitting
to knowledge of the drug contraband, adjusting the headliner panel in the vehicle, and that they
were intending to drop off the cocaine in Columbus, Ohio.  About the time they drove past
Junction City, Kansas on I-70, Agent Anderson read defendant Paez-Mata his *Miranda* rights
and defendant waived them.  The statement was not recorded.

**II.**      **Defendant Paez-Mata's Motion for Discovery Related to Drug Detection Dog**

Defendant Paez-Mata requests discovery of a number of items relating to the training and performance of Wyatt, the canine used by Officer Matthews to conduct the dog sniff of the vehicle.  At the evidentiary hearing, counsel for defendant stated that she had just been provided with discovery about the drug detection dog and requested an additional week to supplement the motion to suppress based on the information in that discovery and the testimony from the hearing.  The Court granted this request and defendant has not supplemented the motion to suppress based on this information.

Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[3]  Absent some additional showing of materiality by defendant, he is entitled to no more than the training and certification records for the specific dog in question during a reasonable period.[4]  The government produced the canine's certification and field performance records, as well as reports that illustrate the canine's reliability rate but declined to produce the other items requested in defendant's motion.  Also, Trooper Matthews testified about the canine's reliability.  He testified that the canine had no serious illnesses or injuries and that he was very reliable as a drug detection dog.  The Court agrees that all that is required in this case is the discovery already produced by the government.  No showing has been made by defendant that further discovery is required.  Therefore, this motion is granted insofar as it requires production of certification and training records, along with any reports that demonstrate the dog's reliability rate.  The

---

[3]373 U.S. 83, 87 (1963).

[4]*See United States v. Lambert*, 351 F. Supp. 2d 1154, 1162 (D. Kan. 2004).

remainder of the motion is denied.

## III.   Motion to Suppress Evidence Derived from the Search

Defendant Paez filed a Motion to Suppress Illegal Seizure and Fruits Thereof.  First, defendant objects to the length of detention, arguing that an objective person would not have felt free to leave after Trooper Wolting returned defendant's documentation.  Second, defendant argues that he was illegally detained because he was told to wait in the police cruiser during the search of the semi-trailer at the Petro station.  "'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[5]  The principles of *Terry v. Ohio*[6] apply to such traffic stops.  Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[7]

### A.     *The Initial Stop*

Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[8]  Reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[9]  Trooper Wolting initially

---

[5]*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[6]392 U.S. 1 (1968).

[7]*Id*. at 19–20.

[8]*United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

[9]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

stopped the semi-trailer truck in this matter for a license tag violation; he could not read the tag

on the vehicle.  K.S.A. § 8-133 requires tags to be "clearly visible, and . . .  maintained free from

foreign materials and in a condition to be clearly legible."  A tag is "clearly legible" when it is

capable of being read by a police officer at a safe following distance.[10]  "Officers should not be

required to stop vehicles in order to read their tags."[11]  The evidence shows that Trooper Wolting

had an objectively reasonable suspicion that the tag in this case violated K.S.A. § 8-133, even

though defendant Paez was able to provide him with current registration information during the

course of the stop.

Irrespective of reasonable suspicion, Trooper Wolting stopped the vehicle in order to

conduct a CVSA inspection. In Kansas, it is permissible for law enforcement officers to stop

commercial vehicles without suspicion that any traffic offense has been committed.[12]  The Court

adopts Judge Crow's reasoning in *Rios-Pinela* that the warrantless inspection of commercial

vehicles under the Kansas regulatory scheme is reasonable under the Fourth Amendment.[13]  On

this basis, the initial stop was justified at its inception.

### B.    Length of Detention

Even if the initial stop of defendant's vehicle was legitimate, the detention must be

"reasonably related in scope to the circumstances which justified the interference in the first

---

[10]*United States v. Garcia-Media*, No. 06-40129-SAC, 2007 WL 1266818, at *4 (D. Kan. Apr. 30, 2007); *United States v. Rubio-Sanches*, No. 05-40081-SAC, 2006 WL 1007252, at *1 (D. Kan. Apr. 17, 2006); *United States v. Granados Orozco*, No. 03-40035-SAC, 2003 WL 22213129, at *2 (D. Kan. Aug. 26, 2003).

[11]*Granados Orozco*, 2003 WL 22213129, at *2.

[12]*United States v. Rios-Pinela*, No. 06-40073-SAC, 2006 WL 2710330, at *2 (D. Kan. Sept. 20, 2006).

[13]*Id.*

place," as required under *Terry*.[14]  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[15]  However, "an officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation."[16]  Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay.[17]

There is no evidence that the stop was prolonged beyond what was necessary to effectuate the purpose of the stop.  Trooper Wolting returned defendant Paez's documents as soon as he conducted the background checks from dispatch, explained that he needed to send in the CVSA form, and told him "thank you, be safe, good luck."  The entire length of time of the roadway stop was about twenty minutes.  Defendant Paez, in fact, continued the encounter by asking Trooper Wolting how far the Petro station was from there.  Only then did Trooper Wolting ask defendant more questions.

### C.      Consent

Defendant next contends that he was illegally detained after Trooper Wolting returned his license and paperwork, and told him "thank you, be safe, good luck."  Defendant argues that these actions did not transform the detention into a consensual encounter because the trooper did

---

[14]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[15]*United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[16]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

[17]*Patten*, 183 F.3d at 1193 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

not "disengage" before asking for consent, may have had his hand on his weapon at the time he asked him if he could ask more questions, was in uniform, and never told defendant Paez that he was free to leave.  Defendant also points out that Trooper Wolting's lights were still flashing during this part of the encounter.

After the purpose of a traffic stop is complete, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible.[18]  In general, prolonging the detention for further questioning beyond that related to the initial stop is permissible in two circumstances: (1) if the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) if the initial detention has become a consensual encounter.[19]

"A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."[20]  The Tenth Circuit follows a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned."[21]  The court has explained,

> The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual.  A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's documentation so long as a reasonable person under the circumstances would believe [they] were free to

---

[18]*United States v. Bradford*, 423 F.3d 1149, 1156-57 (10th Cir. 2005).

[19]*United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

[20]*United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

[21]*Bradford*, 423 F.3d at 1158.

leave or disregard the officers request for information.[22]

Considering the totality of the circumstances, the Court finds that defendant's detention was transformed into a consensual encounter when Trooper Wolting returned defendant's paperwork and told him "thank you, be safe, good luck."  An encounter does not become non-consensual merely because an officer fails to advise a driver that he was free to go.[23]   Before Trooper Wolting asked defendant any further questions, defendant asked him how far away the Petro station was.  Only after answering this question did Trooper Wolting ask defendant if he could ask him more questions and if he could search the vehicle.  Neither Trooper Wolting's testimony, nor the video of the stop, supports the finding that Trooper Wolting made any "coercive show of authority" such that a reasonable person would not have felt free to leave.[24] There is no evidence that the trooper used any force throughout the encounter, brandished his weapon, made any threats or commands, or physically touched defendant.  Finally, Trooper Wolting asked defendant to follow him to the Petro station; but he did not require him to be accompanied.

The Court finds Trooper Wolting's testimony credible that he did not display a coercive show of authority when he returned defendant's documentation.  While defendant is correct that Trooper Wolting testified that it was "possible" he was inside the cab when he asked for consent, and it was "possible" he had his hand on his weapon, he could not specifically recall.  It is clear from viewing the video that Trooper Wolting would have had difficulty speaking to the

---

[22]*Id*. (internal quotations and citations omitted).

[23]*See, e.g., United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006) (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)); *Bradford*, 423 F.3d at 1158.

[24]*United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991) (discussing factors for finding a "coercive show of authority").

11

occupants of the semi-trailer truck if he was standing on the ground, as it sits up significantly from the ground.  Also, there was no delay between when Trooper Wolting said "thank you, be safe, good luck," and when defendant Paez asked for the distance to the Petro station.  There was simply no time for Trooper Wolting to "disengage," by virtue of stepping down from the cab of the truck.  The evidence instead suggests that this was a consensual encounter.

Finally, defendant Paez contends that he was improperly detained during the search of the commercial vehicle at the Petro station when the brothers "were told" to wait in the police vehicle rather than stand next to the truck.  According to defendant, had he been able to observe the search, he could have withdrawn his consent and ordered the officers to stop the search.  But defendant had already consented to the search for a second time at the Petro station.  There was no testimony at the evidentiary hearing that the officers ordered defendants to sit in the police vehicle during the search.  Instead, Trooper Wolting testified that at first defendants stood next to the truck during the search and that, at some point, they sat in the vehicle because it was cold outside.  While Trooper Wolting could not recall who suggested they wait in the police vehicle, rather than stand outside in the cold,  there was no testimony suggesting they were being detained in the police vehicle or that they were not free to stand outside of the vehicle instead or withdraw their previous consent.

## IV.   Motions to Suppress Statements

A law enforcement officer's "failure to administer *Miranda* warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and the confession is inadmissible with no

need for the 'time consuming and difficult enquiry into voluntariness.'"[25]  For the *Miranda*

safeguards to apply, (1) "the suspect must be in 'custody,' and [(2)] the questioning must meet

the legal definition of 'interrogation.'"[26]

   The government bears the burden of showing that these rights were waived and the

voluntariness of the statements.[27]  "But '[a]n express statement of waiver by the defendant is not

required; instead, waiver can be inferred from the defendant's actions and words.'"[28] A waiver is

knowing and intelligent when it is "made with full awareness of both the nature of the right

being abandoned and the consequences of the decision to abandon it."[29]  Although language

barriers my impair a person's ability to knowingly waive his or her rights, as long as the

defendant understands that he does not need to speak to police and that any statement he makes

may be used against him, it is sufficient.[30]

   Defendant Paez contends that his waiver was not knowing and voluntary because he can

barely understand English, as evidenced by the fact that after the interrogation began, the officers

required the assistance of a Spanish-speaking interpreter.  However, the only evidence in the

record about this interrogation is from Officer Heim, who the Court finds to be a credible

---

[25]*United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006) (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (quoting *United States v. Patane*, 542 U.S. 630, 646 (2004) (Souter, J., dissenting))), *cert. denied*, 127 S. Ct. 1343 (2007).

[26]*United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

[27]*Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004) (plurality); *United States v. Nelson*, 450 F.3d 1201, 1209 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 326 (2006).

[28]*Nelson*, 450 F.3d at 1209 (quoting *United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997)).

[29]*United States v. Alarcon*, 95 F. App'x 954, 956 (10th Cir. 2004).

[30]*United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990).

witness.  Heim met with defendant Paez, along with another agent and a Salina police officer who spoke Spanish.  Heim read defendant Paez his *Miranda* rights in English and asked him if he understood.  Defendant Paez said "yes," he understood, but five minutes into the conversation, Heim asked defendant if he wanted to pursue the rest of the interview in Spanish because he was having difficulty understanding the questions posed to him in English and defendant said "yes."  The fact that defendant immediately replied that he understood the questions after being read his *Miranda* rights and then proceeded to speak to the officer, is evidence that defendant Paez understood the *Miranda* warnings.

Defendant Paez-Mata seeks to suppress his statements made on February 26, 2009, arguing that he was never asked if he waived his rights and that such a waiver cannot be inferred from his silence.  Defendant Paez-Mata also contends that he "could not have waived rights which he did not understand."  Two law enforcement officers, Anderson and Heim, testified that Anderson read defendant Paez-Mata his *Miranda* rights and he waived them.  Defendant's attorney Allen also told Anderson that he had been able to communicate with defendant Paez-Mata effectively without an interpreter.  Agent Anderson testified that he was able to converse with defendant Paez-Mata, who gave him a statement admitting to knowledge of the drug contraband, adjusting the headliner panel in the vehicle, and that they were intending to drop off the cocaine in Columbus, Ohio.  The Court finds this testimony to be credible and sufficient to show that defendant Paez-Mata's statements were made knowingly.

Even when a defendant's *Miranda* rights are not violated, the court must still conduct a Fifth Amendment inquiry into the voluntariness of any statement.[31]  The court looks to the

---

[31]*United States v. Roman-Zarate*, 115 F.3d 778, 783 (10th Cir. 1997).

totality of the circumstances in determining whether the statements were voluntary.[32]  In considering whether a statement is of free will, the courts look to several factors, including: "(1) the characteristics of the defendant: age, education, intelligence, and physical and emotional attributes; (2) the circumstances surrounding the statement, including the length of detention and questioning and the location of questioning; and (3) the tactics, if any, employed by officers. . . . In no case, however, is any single factor determinative."[33]  A confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."[34]  Coercive police activity is a necessary predicate to a finding that a confession is not voluntarily within the meaning of the due process clause.[35]  Voluntariness is not at issue with regard to either defendant in this case.  There is no evidence of coercive activity by any of the law enforcement officers involved in either interrogation that would render the confessions involuntary.

Accordingly, both defendants' motions to suppress statements are denied.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Nicolas Paez's Motion to Suppress Illegal Seizure and Fruits Thereof (Doc. 34) and defendant Ramon Paez-Mata's Motion to Suppress Statement (Doc. 16) are **denied**.  Defendant Paez-Mata's Motion for Discovery Related to Drug Detection Dog (Doc. 18) is **granted in part and denied in part** as described in this Order.

Dated:  June 18, 2009

---

[32]*United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997).

[33]*United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987), *cert. denied*, 488 U.S. 983 (1988).

[34]*Malloy v. Hogan*, 378 U.S. 1, 7 (1964).

[35]*See United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998).

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE